**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

SAXON KNIGHT, on behalf of herself and all other :
similarly-situated employees,                :       Civil Action No.: 20-cv-07114
                                        :       (JGK)(RWL)

                    Plaintiff,     :

                                      :

               v.               :       **AMENDED COMPLAINT**

                                      :

DELOITTE & TOUCHE LLP,         :

                                      :       **Jury Trial Demanded**

                    Defendants.    :
------------------------------------------------------------X

Plaintiff Saxon Knight, in this Amended Complaint against Deloitte & Touche LLP

(together, "Deloitte" or "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Deloitte's website is filled with self-promotion related to its parental leave

policies.  Indeed, the site contains article after article touting Deloitte's commitment to

reasonable parental leave policies.[1]  One page brags that "Deloitte's paid family leave

program gives our eligible professionals up to 16 weeks of paid leave, which can be used for

happy occasions – to bond with family after the arrival of a child . . ."

---

[1]     *See*, *e.g.*,
https://www2.deloitte.com/us/en/pages/about-deloitte/articles/inclusion-family-leave-well-being-parental-
caregiver.html#:~:text=Deloitte's%20paid%20family%20leave%20program,sibling%2C%20parent%2C%20or%20grandparent. (last visited August 24, 2020);
https://www2.deloitte.com/global/en/pages/about-deloitte/articles/blogs/empowering-parental-
leave-cruickshank-blog.html (last visited August 24, 2020);
https://www2.deloitte.com/ch/en/pages/careers/articles/deloitte-working-parents-policy.html (last
visited August 24, 2020); https://www2.deloitte.com/au/en/pages/media-releases/articles/new-
era-parental-leave-deloitte-employees-040319.html (last visited August 24, 2020).

2.      Deloitte has even been lauded in the media for being on the cutting edge with respect to parental leave policies.  *See*, *e.g.*, https://www.nbcnews.com/know-your-value/feature/6-companies-redefining-parental-leave-ncna984946.

3.      What Deloitte does not advertise – to its employees or through its public relations team – is that its "willingness" to provide 16 weeks of parental leave comes with a huge catch.

4.      Namely, Deloitte has implemented and enforces the following policy: ***any individual who actually takes the 16 weeks of leave offered to them by Deloitte loses the right to actually return to their prior position – or to any job at Deloitte at all.***

5.      Ms. Knight learned this the hard way.  Following her return from parental leave in late-2019, Ms. Knight discovered that not only would she not be returning to her prior position, but that Deloitte had no position for her at all.

6.      While Ms. Knight attempted to make the best of the situation and find work, she was stymied at every turn.  So, she lodged a complaint of discrimination through Deloitte's integrity helpline, as well as to employee relations.

7.      Just weeks later, Ms. Knight was terminated.

8.      When Ms. Knight inquired as to why her job was not protected, she was repeatedly told that Deloitte has a policy whereby individuals who take more than 12 weeks of parental leave have – in the eyes of Deloitte – no right to return to the position they previously held – or to any position at all.  This is true even though Deloitte purports to provide 16 weeks of parental leave.

9.      It is also true even for those who are ready, willing and able to come back to work within 12 weeks, but – like Ms. Knight – take more than 12 weeks of leave because Deloitte does not disclose that they are giving up their right to a job if they do so.

10.     Simple back of the envelope math indicates that thousands of women – who are of course much more likely than men to take more than 12 weeks of leave – have been impacted by this policy at Deloitte.

11.     Accordingly, Ms. Knight brings this action both on her own behalf, as well as on a class-wide basis in support of all women who have been subjected to Deloitte's brazen discriminatory conduct in violation of the Family and Medical Leave Act ("FMLA"), New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").

12.     Ms. Knight also will file a class-wide Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Pregnancy Discrimination Act ("PDA").  When the EEOC completes its investigation and issues Ms. Knight a Notice of Right to Sue, she will seek leave to amend this complaint to assert individual and class-wide claims under Title VII and the PDA.

**FACTUAL ALLEGATIONS PERTAINING
TO MS. KNIGHT'S INDIVIDUAL CLAIMS**

**I.      BACKGROUND**

13.     Ms. Knight had a lengthy and successful professional career before joining Deloitte in the U.K. in August 2016.

14.     She began her career as a Bureau of Intelligence and Research Analyst at the U.S. State Department, after which she worked for three years as an Energy Security and Counterterrorism Intelligence Analyst at the U.S. Department of Homeland Security.

15.     She followed this experience with a role at the U.S. Department of Energy, where she worked as an International Energy Security & Infrastructure Resiliency Intelligence Analyst.

16.     Ms. Knight's years of high-level government service gave her tremendous experience and credibility in the security space.  Ms. Knight parlayed this experience into a

3

successful consulting business before taking roles at BNY Mellon (Vice President, Global Head of Cyber Threat Intelligence) and Target (Director of Cyber Threat Intelligence).

17.     In 2016, Ms. Knight was recruited to join Deloitte U.K. as a Director within the Risk Advisory division.

18.     After a successful stint in the U.K., in February 2018, Ms. Knight joined the U.S. firm as a Senior Manager at the urging of Advisory Partner Adnan Amjad.

## II.     MS. KNIGHT'S PERFORMANCE AT DELOITTE U.S.

19.     From February 2018 through January 2019, Ms. Knight reported to Global Partner Isaac Kohn and was responsible for leading "Project X," which was a penetration testing project ultimately aimed at reducing Deloitte's vulnerability to cyber threats.

20.     In this role, Ms. Knight was responsible for running daily operations for Project X with the global team and overseeing the design and operationalization of the "Red Team," along with regular and *ad hoc* situational updates with Cyber Acceleration Project leadership.

21.     Ms. Knight excelled in this role and, in August 2018, Mr. Amjad asked her to take on an additional role as the Solution Manager for Managed Threat Services (later renamed Fusion Managed Services).

22.     For nearly six months, Ms. Knight simultaneously performed both the Project X and Solution Manager roles.

23.     Ms. Knight performed the Solution Manager role from August 2018 through May 2019.  In that role, Ms. Knight was a part of a three-person team.  At first, the team consisted of Kent Cinquegrana (Managing Director) and Steven Kane (Senior Manager).  Mr. Kane was later replaced by Robert Boshonek (Managing Director).  Of the three people on this team during the

latter part of her role as Solution Manager, Ms. Knight was the only woman and the only member of the team that was not a Managing Director.

24.     As in her prior roles with Deloitte, Ms. Knight excelled in the Solution Manager role.  During her time in that role, she: (i) oversaw the buildout of the Fusion Managed Services strategy; (ii) managed the creation of roadmap and marketing materials, including Client POV, Client Renewal Playbook, Business Case, Future State Roadmap, Go-to-Market Strategy, Placemat/Sales Sheet, Proposal Deck, Service Catalog, Service Definition, Solution Strategy, Brochure, RFP RACI, Core Service Components, Copy for websites, press releases, video scripts, message map documents, voiceover for a Brainshark video, slide decks for All-Hands calls, Engagement Letters and Statement of Work templates; (iii) performed all solution architecting for the entire portfolio; and (iv) handled most internally-facing Solution Executive matters on Mr. Cinquegrana's behalf while he focused on client sales and external-facing matters.

25.     During this time, Ms. Knight was also involved in leadership meetings with Managing Directors and Partners, as well as high-level discussions and decision-making processes related to Fusion Managed Services.

III.    **MS. KNIGHT RETURNS FROM LEAVE AND HER JOB IS GONE**

26.     In the fall of 2018, Ms. Knight was overjoyed to learn that she was pregnant with her second child, who was due on May 30, 2019.

27.     In April 2019, in anticipation of Ms. Knight's impending maternity leave, she was informed by Mr. Cinquegrana that while she was on leave her role would be performed by Melissa Levy, Vice President of Solution Management.

28.     However, both Mr. Cinquegrana (who was, by then, Ms. Knight's direct supervisor) and Mr. Amjad (Mr. Cinquegrana's supervisor) assured Ms. Knight that she would be reinstated to her role upon her return from maternity leave.  This, of course, is what the FMLA requires.

29.     Ms. Knight went into labor on May 30, 2019 and began her maternity leave at that time.

30.     Ms. Knight took more than 12 weeks of parental leave pursuant to Deloitte's parental leave policies.  At no point in time was Ms. Knight notified that she would be penalized for taking leave as allowed for by Deloitte, nor was she told that she would be losing any rights in the event that she did not return to work within 12 weeks.  If Ms. Knight had been informed that she would be losing rights in the event that she did not return to work within 12 weeks, she would have returned to work within 12 weeks, as she was ready, willing and able to do so.

31.     In November 2019, Ms. Knight communicated with Mr. Cinquegrana about her planned December 4, 2019 return to work, and she did in fact return to work on that date.

32.     Prior to Ms. Knight's return to work, no one, at any point in time, suggested that she would not return to her Solution Manager role.

33.     However, when Ms. Knight returned, it quickly became clear that she would not only not be reintegrated into her prior role but also that Deloitte had no plans whatsoever for her.

34.     Upon her return from leave, Ms. Knight made multiple efforts to discuss her role and next steps with Mr. Cinquegrana, all of which went ignored.

35.     When she finally was able to reach him, Mr. Cinquegrana spoke in circles, failed to clarify whether Ms. Knight would be returning to her role and could not even assure Ms. Knight that there was any place for her at Deloitte.  To the contrary – he told her, "you are

swimming around looking for work, and you need to find the shore and start work.  You are not safe in your job unless you do."

36.     Frustrated by Mr. Cinquegrana's runaround, on December 11, 2019, Ms. Knight emailed Mr. Boshonek to ask him for a copy of Fusion Managed Services' organizational chart. Mr. Boshonek failed to send an organizational chart and responded only by stating that, "the structure is pretty much the same, but we can discuss the differences."

37.     When Ms. Knight and Mr. Boshonek spoke, Mr. Boshonek confirmed that the organizational structure had not changed but, nevertheless, told Ms. Knight that there was no longer any work for her in Fusion Managed Services.  During this conversation, Mr. Boshonek also stated that while Ms. Knight might "be safe for a little while" because she had just returned from leave, she would not be safe "for long."

38.     The reason that there was no more work for Ms. Knight was clear: Deloitte had replaced her while she was on maternity leave and simply refused to reinstate her to her prior position as required by law.

39.     Indeed, through at least the time of Ms. Knight's termination, Deloitte's intranet site identified Ms. Levy as still holding the role of Solution Manager for Fusion Managed Services.  The exact role held by Ms. Knight prior to her leave.

40.     Ms. Knight was naturally concerned about the communications she was having with Messrs. Cinquegrana and Boshonek, so, on December 13, 2019, she sent an email to Mr. Amjad.  In her December 13, 2019 email, entitled "Concerned about my role," Ms. Knight complained about the fact that no one would even tell her whether she had a role at Deloitte and, if so, what the role was.

41.     Rather than responding in email, Mr. Amjad suggested that Ms. Knight call him. She did so, but Ms. Knight was provided with no further clarity on her role (nor was she told whether she even had one).

42.     In a months-long attempt to identify a role and corresponding meaningful work activities, from December 2019 through May 2020, Ms. Knight had dozens of conversations to try to clarify her role and/or find work at Deloitte.  These communications were with, among others, Mr. Cinquegrana, Mr. Boshonek, Mr. Amjad, Katrina Sierant (Ms. Knight's Talent Advisor), Jill Johnston, Linda Walsh (Ms. Knight's Coach), Taryn Aguas (Ms. Knight's former Coach), Mark Nicholson, Srini Subramanian, Nick Seaver, Andrew Rafla, Kieran Nagaraj, Piyush Pandey, Andrew Morrison, Daniel Soo, Mr. Kohn and Julie Bernard.

43.     Ms. Knight repeatedly offered her services and support and inquired about work and potential roles in both the Commercial and Federal ("GPS") spaces.

44.     Despite Ms. Knight's exceptional qualifications, experience and performance, her offers to help were almost universally turned down.

45.     Nevertheless, throughout the spring of 2020, from January until May, Mr. Amjad repeatedly told Ms. Knight that she was not slated for termination.  Specifically, he stated, more than once, "don't worry," "stop freaking out," "calm down," "there is no list of people being fired that has your name on it, and I see all the lists'' and "your job is secure."

46.     At Ms. Knight's request to expand her search for work outside of the Commercial practice, Mr. Amjad also put Ms. Knight in touch with Mr. Subramanian, the Advisory Sector Leader for the State & Local Government, Higher Education practice, which sits within Deloitte's Federal Practice.

47.     Mr. Subramanian passed Ms. Knight off to Mr. Pandey, a Managing Director in Deloitte's GPS practice.

48.     Mr. Pandey assigned Ms. Knight to a grand total of two projects.  Collectively, Ms. Knight was permitted to bill these clients for a total of only 5-10 hours per week and was, thus, having to charge the remaining hours of work to Practice Development ("PRD") codes.  At the same time, Ms. Knight was told by several of her superiors that excessive charging to PRD codes would put her at risk of increased negative scrutiny from Deloitte.

49.     The only other work assigned to Ms. Knight was administrative in nature; *e.g.*, updating slides, editing outlines for debriefs, asking the Fusion Managed Services Threat Intelligence team to create reports for several client calls, finding PowerPoint decks and other written materials, etc.

50.     This work, of course, was not commensurate with Ms. Knight's skills and experiences.  It was demeaning and served no career development purpose whatsoever.

51.     Moreover, Ms. Knight was not even able to obtain any meaningful feedback regarding her performance with respect to the work she was performing.  Ms. Knight sent multiple "performance snapshot" requests to Mr. Cinquegrana, including on January 7, 2020, February 6, 2020 and February 28, 2020.  All were ignored, and Mr. Cinquegrana *via* email told Ms. Knight he would communicate his performance feedback directly to her Coach, Ms. Walsh.

52.     From the time Ms. Knight returned from maternity leave until the end of the Performance Year, only one performance snapshot was completed on her behalf.  In April, Ms. Knight became extremely concerned that her Performance Scatterplot which had heretofore placed her in the upper right quadrant (strong performance) was now placing her in the middle of the quadrant, far below her peers and her prior performance.

## IV.    MS. KNIGHT COMPLAINS ABOUT DISCRIMINATION AND IS PROMPTLY TERMINATED

53.    On April 8, 2020, Ms. Knight sent a text message to Ms. Walsh which stated, *inter alia*, "I am worried that being gone for half the year on maternity leave and having only two snapshots (though I requested more!) is really going to hurt me … What do you think?''

54.    Ms. Walsh, who was purportedly serving as Ms. Knight's coach, did not even bother to respond to this message.

55.    Ms. Knight followed up with another text message five days later.  Ms. Walsh again failed to respond.

56.    Things only got worse and more confusing.  On May 4, 2020, Ms. Knight received an email from Carey Oven, the Chief Talent Officer for U.S. Advisory.  The email listed Ms. Knight's "affiliations," all of which related to Financial Services and Cyber & Strategic Risk.

57.    After receipt of this email, on May 12, 2020, Ms. Knight called Mr. Amjad to ask when she would actually be permitted to work in these areas again.

58.    Mr. Amjad curtly advised Ms. Knight that: (i) she would never rejoin his organization; (ii) she had been "fully transitioned" over to GPS; and (iii) the only reason he was still taking her calls was to ensure that the transition was complete.

59.    However, when Ms. Knight sought to confirm this with Mr. Subramanian, he told Ms. Knight that she had not been transitioned to GPS and never would be.  He also gratuitously told her that she would "never succeed in GPS and w[ill] not be able to make the metrics for either managed revenue or sales because [you] ha[ve] no network created and no one in GPS kn[o]w[s] [you] or [your] past work."

10

60.     This disconnect between Mr. Amjad, who no longer wanted and/or had room for Ms. Knight in his organization because of her pregnancy and leave, and Mr. Subramanian was never fully resolved.

61.     On May 21, 2020, Ms. Knight emailed Mr. Amjad and Mr. Subramanian, and copied in Ms. Sierant.  In this email she explained her confusion by forwarding the original email from Ms. Oven showing Ms. Knight's assigned affiliations and informing Mr. Amjad that Mr. Subramanian had no intention of welcoming Ms. Knight into the GPS practice.

62.     Almost three weeks later, on June 10, 2020, Mr. Amjad finally responded admitting that Ms. Knight was not formally aligned to the GPS practice.  He went on to state that he had connected Ms. Knight with contacts to try and "expand [her] network and help build traction."  He further stated that he had "made other introductions to support you in your efforts to expand your network but have not seen sufficient progress,'' and suggested that she reach out to Mr. Nicholson to explore opportunities within the Financial Services Practice.

63.     However, Ms. Knight had been in contact with Mr. Nicholson regularly since returning from maternity leave (and had previous contact with Mr. Nicholson when he asked her to assume a leadership role within Financial Services in the fall of 2019, but Mr. Amjad dissuaded Ms. Knight from accepting this role), and had scheduled bi-weekly phone calls over the prior months with him to maintain connectivity and inquire about work within the Financial Services practice.

64.     Left with no other choice, in May 2020 Ms. Knight reached out to Deloitte's Integrity Helpline to inquire if her experience and treatment when returning from maternity leave was indeed normal and ethical.

11

65.     On May 13, 2020, Ms. Knight spoke *via* Skype with Lead Employee Relations Specialist Donna Rosario.  During this Skype call, Ms. Knight laid out all of the foregoing and explicitly stated that she believed that the foregoing was a result of her pregnancy and related leave.

66.     At the end of the call, rather than expressing sympathy, Ms. Rosario inappropriately demanded to know what Ms. Knight was "looking to get out of this."  Ms. Knight, who was simply trying to have the aforementioned issues resolved, explained that she "just want[ed] to find work," feel secure and have a lasting career at Deloitte.

67.     Unfortunately, as a result of her pregnancy and leave, as well as her protected complaints, her career at Deloitte was about to end.

68.     On June 12, 2020, Ms. Rosario informed Ms. Knight that she had "investigated" her concerns and determined that Deloitte had complied with its legal obligations.  Ms. Rosario further informed Ms. Knight that she had "closed" the case.  Ms. Rosario stated that Deloitte had fulfilled its obligations by giving her a paycheck and a title.  When Ms. Knight asked if not returning to having a role, or any meaningful work was also an obligation of Deloitte, Ms. Rosario said it was not.

69.     Less than one month later, on July 8, 2020, Ms. Knight was summarily terminated by Mr. Amjad.

70.     The termination occurred over a Zoom call, and Talent Business Analyst Adriana D'Arco was on the call as well.  Ms. Knight was told that her termination was "related to COVID" and that her last day of work would be the following day, July 9, 2020.  She also was told multiple times that the termination was not performance related.

71.     Ms. Knight expressed her belief that the termination was likely in retaliation for her recent ethics complaint against Mr. Amjad.  Ms. D'Arco responded by directing Mr. Amjad to get off the Zoom call.  She then told Ms. Knight that she would look into the matter further but continued with the termination logistics.

72.     Approximately four hours later, Ms. Knight emailed Ms. D'Arco to follow up on her concerns.  Ms. D'Arco said that she had escalated the issue to the National Talent Relations team.

73.     Just a few minutes later, Kristen Sturman, Lead Employee Relations Specialist, called and told Ms. Knight that: (i) her termination was not performance related; (ii) extensive thought went into the decision to "eliminate her position;" and (iii) there was no requirement for Deloitte to return Ms. Knight to her prior role because the FMLA only provides for 12 weeks of leave, and Deloitte permits six months.  Ms. Sturman intimated to Ms. Knight that her role might have been better protected had she returned from leave after the 12 weeks of FMLA leave, instead of taking the additional time offered by Deloitte.

74.     This "explanation" for Ms. Knight's termination is clearly pretextual.  To begin, Ms. Knight's position was not eliminated.  At the time of her termination, Ms. Levy was still listed on the Fusion Managed Services intranet page as holding the role that Ms. Knight relinquished when she took leave.

75.     Second, even assuming that Ms. Knight's role had been eliminated, Deloitte stymied her myriad efforts to find a new role, as described above.

76.     Moreover, in the weeks prior to her termination, Ms. Knight was being recruited for a role by Mr. Nicholson, the Leader of Deloitte's Financial Services Industry practice.  In fact, on July 7, 2020, the day before she was terminated, Mr. Nicholson and Ms. Knight had a

22-minute call about the details of her new leadership role within the Financial Services practice, reporting directly to Mr. Nicholson, which he stated he intended for her to perform "for at least this upcoming performance year." Clearly, there was no need to terminate Ms. Knight because her position had supposedly been eliminated.

77.     Finally, Ms. Sturman's articulation of the requirements of the FMLA is summarily incorrect and, given that it is Deloitte's practice not to provide FMLA rights to those who take advantage of Deloitte's extended leave policies, there are likely many, many other women who have been disparately impacted by Deloitte's facially unlawful policy.

78.     Shortly after Ms. Knight's dismissal from Deloitte, she had a conversation with a Partner at the Firm who informed Ms. Knight that she (the Partner) and others inside the Firm were aware of Ms. Knight's situation and that there is a prevalent issue of the Firm "sidelining" and then terminating the employment of individuals returning from the company-offered parental leave program.

## CLASS ALLEGATIONS PERTAINING TO UNLAWFUL
## INTERFERENCE AND RETALIATION IN VIOLATION OF THE FMLA

79.     As noted above, Deloitte maintains a policy through which individuals returning from a parental leave are not guaranteed their jobs and/or a substantially similar job unless they return within the 12 week period covered by the FMLA. This policy applies even where the individuals taking leave were ready, willing and able to return to work at the end of the 12 week period but did not do so because Deloitte's parental leave policies permitted them to take additional leave.

80.     This policy violates the FMLA and constitutes both interference with rights guaranteed under the FMLA, as well as retaliation against those who exercise said rights.

## I.     CLASS DEFINITION

81.     This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23. This action is brought by Ms. Knight on behalf of a "Proposed FMLA Class."  The Proposed FMLA Class is defined (subject to future revision if necessary) as follows:

> **All women working for Deloitte in the United States who have taken a parental leave exceeding 12 weeks.**

82.     In order to be a member of one or both of the Proposed FMLA Classes, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed FMLA Class Period").

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

83.     Deloitte employs 80,000 individuals in the U.S.

84.     Approximately 44% of Deloitte's U.S. workforce is female.  Thus, Deloitte employs approximately 38,730 women in the U.S.

85.     At any given time, approximately 5% of women in the U.S. are pregnant.  As such, there are approximately 2,000 women who become pregnant at Deloitte in the U.S. each year.

86.     Given that Deloitte's policies permit women to take more than 12 weeks of parental leave before returning to work, upon information and belief, the vast majority of the women returning from leave return more than 12 weeks after commencing leave.

87.     Upon information and belief at least 1,500 women per year in the U.S. return to Deloitte following parental leave more than 12 weeks after commencing leave.

88.     These women return to Deloitte without the right to return to their prior job or a role substantially similar to that of their prior job.  Upon information and belief, more than 40 of these women were not in fact returned to their job or given a substantially similar role.

89.     As such, the members of the Proposed FMLA Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of members of the Proposed FMLA Class is unknown because such information is in the exclusive control of Deloitte, upon information and belief there more than 4,000 current and former members of the Proposed FMLA Class, hundreds, if not thousands, of whom were not in fact returned to their job or given a substantially similar role.

90.     Although precise determination of the number of members of the Proposed FMLA Class is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.   COMMON QUESTIONS OF LAW AND FACT

91.     The claims alleged on behalf of the Plaintiff and the members of the Proposed FMLA Class raise common questions of law and fact applicable to all claims.  Chief among these questions are as follows:

- Whether Deloitte has a policy whereby employees who take more than 12 weeks of parental leave return to work without any guarantee with respect to returning to their job or being given a substantially similar role, even where such individuals were ready, willing and able to return to work within 12 weeks and only took additional leave because it is permitted by Deloitte's policies;

- Whether employees who take more than 12 weeks of parental leave do in fact return to work without any guarantee with respect to returning to their job or being given a substantially similar role;

- Whether employees who take more than 12 weeks of parental leave are not given the same or a substantially similar role upon their return from leave; and

16

- Whether Deloitte's policies as outlined herein constitute interference or retaliation under the FMLA.

## IV.  **TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

92.    Plaintiff is a member of the Proposed FMLA Class that she seeks to represent.

93.    The claims of Plaintiff are typical of the claims of the members of the Proposed FMLA Class in that they all arise from the same unlawful patterns, practices and/or policies of Deloitte and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by the FMLA.

94.    Plaintiff and the members of the Proposed FMLA Class all allege that they each were the victim of violations of the FMLA sounding in interference and retaliation.

95.    The relief that Plaintiff seeks for Deloitte's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed FMLA Class.

96.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.  **ADEQUACY OF REPRESENTATION**

97.    The interests of Plaintiff are co-extensive with those of the members of the Proposed FMLA Class that she seeks to represent in the instant case.

98.    Plaintiff is willing and able to represent the members of the Proposed FMLA Class fairly and vigorously as she pursues her similar individual claims.

99.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

100.    The combined interests, experience and resources of Plaintiff and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

101.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

102.    Specifically, all evidence of Deloitte's patterns, practices and/or policies and the issue of whether they are in violation of the FMLA would be exchanged and litigated repeatedly.

103.    Accordingly, certification of the Proposed FMLA Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the members of the Proposed FMLA Class and Deloitte.

104.    By filing this action, Plaintiff is preserving the rights of members of the Proposed FMLA Class with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

105.    Deloitte has acted on grounds, described herein, generally applicable to Plaintiff and the members of the Proposed FMLA Class, by adopting and following systemic patterns, practices and/or policies that constitute unlawful interference and retaliation under the FMLA, impacting equally the Plaintiff and the members of the Proposed FMLA Class.

106.    These discriminatory and retaliatory acts are fostered by Deloitte's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff and the members of the Proposed FMLA Class as a whole.

107.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of a policy implemented by Deloitte that results in violations of the rights afforded to Plaintiff and the members of the Proposed FMLA Class under the FMLA.

108.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff and the members of the Proposed FMLA Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, unlawful conduct under the FMLA.

109.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**C.    <u>Rule 23(b)(3)</u>**

110.    The common issues of fact and law affecting Plaintiff's claims and those of the members of the Proposed FMLA Class, relating to Deloitte's violations of the FMLA, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

111.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the members of the Proposed FMLA Class.

112.    The cost of proving Deloitte's pattern and practice of FMLA violations makes it impracticable for the members of the Proposed FMLA Class to pursue their claims individually.

113.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed FMLA Class, as well as the common questions of law and fact described above.

## CLASS ALLEGATIONS PERTAINING TO UNLAWFUL DISPARATE TREATMENT DISCRIMINATION BASED ON GENDER AND PREGNANCY IN VIOLATION OF THE NYSHRL AND NYCHRL

114.     As noted above, Deloitte maintains a policy through which individuals returning from a parental leave are not guaranteed their jobs and/or a substantially similar job unless they return within the 12 week period covered by the FMLA.  This policy applies even where the individuals taking leave were ready, willing and able to return to work at the end of the 12 week period but did not do so because Deloitte's parental leave policies permitted them to take additional leave.

115.     This policy discriminates against women who become pregnant and take parental leave, and each time this policy is utilized, it constitutes an act of unlawful disparate treatment discrimination under the NYSHRL and NYCHRL.

## I.     CLASS DEFINITION

116.     This is a class action pursuant to FRCP 23.  This action is brought by Ms. Knight on behalf of a "Proposed Disparate Treatment Class."  The Proposed Disparate Treatment Class is defined (subject to future revision if necessary) as follows:

> **All women working for Deloitte in New York State who have taken a parental leave exceeding 12 weeks.**

117.     This action is also brought by Ms. Knight on behalf of a "Proposed Disparate Treatment NYC Subclass."  The Proposed Disparate Treatment NYC Subclass is defined (subject to future revision if necessary) as follows:

> **All women working for Deloitte in New York City who have taken a parental leave exceeding 12 weeks.**

118.    The Proposed Disparate Treatment Class and Proposed Disparate Treatment NYC Subclass are hereinafter referred to as the Proposed Disparate Treatment Classes.

119.    In order to be a member of one or both of the Proposed Disparate Treatment Classes, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed Disparate Treatment Classes Class Period").

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

120.    Deloitte employs over 5,000 individuals in New York.

121.    Approximately 44% of Deloitte's U.S. workforce is female.  Thus, Deloitte employs approximately 2,200 women in New York.

122.    At any given time, approximately 5% of women in the U.S. are pregnant.  As such, there are approximately 110 women who become pregnant at Deloitte in New York each year.

123.    Given that Deloitte's policies permit women to take more than 12 weeks of parental leave before returning to work, upon information and belief, the vast majority of the women returning from leave return more than 12 weeks after commencing leave.  Upon information and belief, more than 40 of these women were not in fact returned to their job or given a substantially similar role.

124.    Upon information and belief, at least 75 women per year in New York return to Deloitte following parental leave more than 12 weeks after commencing leave.  Upon information and belief, during the limitations period, more than 40 of these women were not in fact returned to their job or given a substantially similar role.

21

125.    As such, the members of the Proposed Disparate Treatment Classes are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of members of the Proposed Disparate Treatment Classes is unknown because such information is in the exclusive control of Deloitte, upon information and belief, there more than 4,000 current and former members of the Proposed Disparate Treatment Classes, hundreds, if not thousands, of whom were not in fact returned to their job or given a substantially similar role.

126.    Although precise determination of the number of members of the Proposed Disparate Treatment Classes is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

127.    The claims alleged on behalf of the Plaintiff and the members of the Proposed Disparate Treatment Classes raise common questions of law and fact applicable to all claims. Chief among these questions are as follows:

- Whether Deloitte has a policy whereby employees who take more than 12 weeks of parental leave return to work without any guarantee with respect to returning to their job or being given a substantially similar role;

- Whether employees who take more than 12 weeks of parental leave do in fact return to work without any guarantee with respect to returning to their job or being given a substantially similar role;

- Whether employees who take more than 12 weeks of parental leave are not given the same or a substantially similar role upon their return from leave; and

- Whether Deloitte's policies as outlined herein constitute gender or pregnancy discrimination under the NYSHRL or NYCHRL.

**IV.      TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

128.     Plaintiff is a member of the Proposed Disparate Treatment Classes that she seeks to represent.

129.     The claims of Plaintiff are typical of the claims of the members of the Proposed Disparate Treatment Classes in that they all arise from the same unlawful patterns, practices and/or policies of Deloitte and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by the NYSHRL and NYCHRL.

130.     Plaintiff and the members of the Proposed Disparate Treatment Classes all allege that they each were the victim of violations of the NYSHRL and NYCHRL sounding in gender and pregnancy discrimination.

131.     The relief that Plaintiff seeks for Deloitte's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Disparate Treatment Classes.

132.     Thus, the typicality requirement of FRCP 23(a) is satisfied.

**V.       ADEQUACY OF REPRESENTATION**

133.     The interests of Plaintiff are co-extensive with those of the members of the Proposed Disparate Treatment Classes that she seeks to represent in the instant case.

134.     Plaintiff is willing and able to represent the members of the Proposed Disparate Treatment Classes fairly and vigorously as she pursues her similar individual claims.

135.     Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

136.    The combined interests, experience and resources of Plaintiff and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

137.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

138.    Specifically, all evidence of Deloitte's patterns, practices and/or policies and the issue of whether they are in violation of the NYSHRL or NYCHRL would be exchanged and litigated repeatedly.

139.    Accordingly, certification of the Proposed Disparate Treatment Classes is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the members of the Proposed Disparate Treatment Classes and Deloitte.

140.    By filing this action, Plaintiff is preserving the rights of members of the Proposed Disparate Treatment Classes with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.    Rule 23(b)(2)

141.    Deloitte has acted on grounds, described herein, generally applicable to Plaintiff and the members of the Proposed Disparate Treatment Classes, by adopting and following systemic patterns, practices and/or policies that constitute violations of the NYSHRL and

NYCHRL and impact equally the Plaintiff and the members of the Proposed Disparate Treatment Classes.

142.    These discriminatory and retaliatory acts are fostered by Deloitte's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff and the members of the Proposed Disparate Treatment Classes as a whole.

143.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of a policy implemented by Deloitte that results in violations of the rights afforded to Plaintiff and the members of the Proposed Disparate Treatment Classes under the NYSHRL and NYCHRL.

144.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff and the members of the Proposed Disparate Treatment Classes' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, violations of the NYSHRL and NYCHRL.

145.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**C.      Rule 23(b)(3)**

146.    The common issues of fact and law affecting Plaintiff's claims and those of the members of the Proposed Disparate Treatment Classes, relating to Deloitte's violations of the NYSHRL and NYCHRL, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

147.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the members of the Proposed Disparate Treatment Classes.

148.    The cost of proving Deloitte's pattern and practice of NYSHRL and NYCHRL violations makes it impracticable for the members of the Proposed Disparate Treatment Classes to pursue their claims individually.

149.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Disparate Treatment Classes, as well as the common questions of law and fact described above.

## CLASS ALLEGATIONS PERTAINING TO UNLAWFUL DISPARATE IMPACT DISCRIMINATION IN VIOLATION OF THE NYSHRL AND NYCHRL

150.    As noted above, Deloitte maintains a policy through which individuals returning from a parental leave are not guaranteed their jobs and/or a substantially similar job unless they return within the 12 week period covered by the FMLA.

151.    This policy is facially neutral because it applies to men, women and non-binary individuals equally.  Put another way, whether you are a man, woman or non-binary, you are not guaranteed to return to your job and/or a substantially similar job unless you return from parental leave within the 12 week period covered by the FMLA.

152.    In reality, this purportedly facially neutral policy has a disparate impact on women.

153.    Deloitte employs 80,000 individuals in the United States and over 5,000 in New York.

154.    Approximately 44% of Deloitte's U.S. workforce is female.  Thus, Deloitte employs approximately 38,730 women in the U.S., and approximately 2,200 women in New York.

155.    At any given time, approximately 5% of women in the U.S. are pregnant.  As such, there are approximately 2,000 women who become pregnant at Deloitte in the U.S. each year, and 110 women who become pregnant at Deloitte in New York each year.

156.    Given that Deloitte's policies permit women to take more than 12 weeks of parental leave before returning to work, upon information and belief, the vast majority of the women returning from leave return more than 12 weeks after commencing leave.

157.    Upon information and belief at least 1,500 women in the U.S., and 75 women in New York, return to Deloitte following parental leave more than 12 weeks after commencing leave.  Upon information and belief, during the limitations period, more than 40 of these women (nationally and within New York) were not in fact returned to their job or given a substantially similar role.

158.    According to Deloitte's policies, none of these women return to Deloitte with any guarantee that their job will be returned to them and/or that they will be given a substantially similar role.

159.    According to research done by Deloitte, men are "far more likely to indicate that they do not plan to take advantage of their workplace paid parental leave benefits."  As a result, upon information and belief, few if any men working for Deloitte in the U.S. have taken parental leaves exceeding 12 weeks.  Thus, all or virtually all men taking parental leave return to work with a guarantee that they will be returned to their job or placed in a substantially similar role.

160.     In short, Deloitte's policy, which denies employees the right to return to their position or a substantially similar position if they exceed a 12 week parental leave, is not only unlawful under the FMLA but also results in a disparate impact against women in violation of the NYSHRL and the NYCHRL.

161.     This disparate impact claim is appropriately brought on behalf of a class of women who have been subjected to this unlawful policy.

## I.     CLASS DEFINITION

162.     This is a class action pursuant to FRCP 23.  This action is brought by Ms. Knight on behalf of a "Proposed Disparate Impact Class."  The Proposed Disparate Impact Class is defined (subject to future revision if necessary) as follows:

> **All women working for Deloitte in New York State who have taken a parental leave exceeding 12 weeks.**

163.     This action is also brought by Ms. Knight on behalf of a "Proposed Disparate Impact NYC Subclass."  The Proposed Disparate Impact NYC Subclass is defined (subject to future revision if necessary) as follows:

> **All women working for Deloitte in New York City who have taken a parental leave exceeding 12 weeks.**

164.     The Proposed Disparate Impact Class and Proposed Disparate Impact NYC Subclass are hereinafter referred to as the Proposed Disparate Impact Classes.

165.     In order to be a member of one or both of the Proposed Disparate Impact Classes, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed Disparate Impact Classes Class Period").

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

166.    The members of the Proposed Disparate Impact Classes are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of members of the Proposed Disparate Impact Classes is unknown because such information is in the exclusive control of Deloitte, upon information and belief, there more than 200 current and former members of the Proposed Disparate Impact Classes.

167.    Although precise determination of the number of members of the Proposed Disparate Impact Classes is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

168.    The claims alleged on behalf of the Plaintiff and the members of the Proposed Disparate Impact Classes raise common questions of law and fact applicable to all claims.  Chief among these questions are as follows:

- Whether Deloitte has a policy whereby employees who take more than 12 weeks of parental leave return to work without any guarantee with respect to returning to their job or being given a substantially similar role;

- Whether employees who take more than 12 weeks of parental leave do in fact return to work without any guarantee with respect to returning to their job or being given a substantially similar role;

- Whether employees who take more than 12 weeks of parental leave are not given the same or a substantially similar role upon their return from leave; and

- Whether men are subjected to discriminatory disparate impact as a result of Deloitte's policy whereby employees who take more than 12 weeks of parental leave return to work without any guarantee with respect to returning to their job or being given a substantially similar role.

## IV.     TYPICALITY OF CLAIMS AND RELIEF SOUGHT

169.     Plaintiff is a member of the Proposed Disparate Impact Classes that she seeks to represent.

170.     The claims of Plaintiff are typical of the claims of the members of the Proposed Disparate Impact Classes in that they all arise from the same unlawful patterns, practices and/or policies of Deloitte and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state and local law.

171.     Plaintiff and the members of the Proposed Disparate Impact Classes all allege that they each were the victim of an unlawful discriminatory disparate impact resulting from Deloitte's policy whereby employees who take more than 12 weeks of parental leave return to work without any guarantee with respect to returning to their job or being given a substantially similar role.

172.     The relief that Plaintiff seeks for Deloitte's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Disparate Impact Classes.

173.     Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.     ADEQUACY OF REPRESENTATION

174.     The interests of Plaintiff are co-extensive with those of the members of the Proposed Disparate Impact Classes that she seeks to represent in the instant case.

175.     Plaintiff is willing and able to represent the members of the Proposed Disparate Impact Classes fairly and vigorously as she pursues her similar individual claims.

176.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

177.    The combined interests, experience and resources of Plaintiff and her counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)

### A.    Rule 23(b)(1)

178.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

179.    Specifically, all evidence of Deloitte's patterns, practices and/or policies and the issue of whether they are in violation of state and local law would be exchanged and litigated repeatedly.

180.    Accordingly, certification of the Proposed Disparate Impact Classes is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the members of the Proposed Disparate Impact Classes and Deloitte.

181.    By filing this action, Plaintiff is preserving the rights of members of the Proposed Disparate Impact Classes with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**B.**     **Rule 23(b)(2)**

182.    Deloitte has acted on grounds, described herein, generally applicable to Plaintiff and the members of the Proposed Disparate Impact Classes, by adopting and following systemic patterns, practices and/or policies that are discriminatory towards the Plaintiff and the members of the Proposed Disparate Impact Classes.

183.    These discriminatory and retaliatory acts are fostered by Deloitte's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the members of the Proposed Disparate Impact Classes as a whole.

184.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of a policy implemented by Deloitte that results in an unlawful discriminatory impact based on the gender of Plaintiff and the members of the Proposed Disparate Impact Classes.

185.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff and the members of the Proposed Disparate Impact Classes' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, unlawful discriminatory impact based on the gender.

186.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**C.**     **Rule 23(b)(3)**

187.    The common issues of fact and law affecting Plaintiff's claims and those of the members of the Proposed Disparate Impact Classes relating to the unlawful discriminatory

impact based on the gender, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

188.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the members of the Proposed Disparate Impact Classes.

189.    The cost of proving Deloitte's pattern and practice of unlawful disparate impact discrimination makes it impracticable for the members of the Proposed Disparate Impact Classes to pursue their claims individually.

190.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Disparate Impact Classes, as well as the common questions of law and fact described above.

**FIRST CAUSE OF ACTION**
**(Interference in Violation of the FMLA – Individual and Class Claims)**

191.    Plaintiff, on behalf of herself and the Proposed FMLA Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

192.    As described above, Deloitte has committed violations of the FMLA against Plaintiff and the members of the Proposed FMLA Class by, *inter alia*, interfering with the rights afforded to Plaintiff and the members of the Proposed FMLA Class under the FMLA.

193.    As a direct and proximate result of Deloitte's unlawful interference in violation of the FMLA, Plaintiff and the members of the Proposed FMLA Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

194.     Deloitte's unlawful conduct in violation of the FMLA was intentional and/or was not carried out in good faith and, therefore, Plaintiff and the members of the Proposed FMLA Class are entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the FMLA – Individual and Class Claims)

195.     Plaintiff, on behalf of herself and the Proposed FMLA Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

196.     As described above, Deloitte has committed violations of the FMLA against Plaintiff and the members of the Proposed FMLA Class by, *inter alia*, retaliating against Plaintiff and the members of the Proposed FMLA Class for their assertion of rights protected by the FMLA.

197.     As a direct and proximate result of Deloitte's unlawful retaliation in violation of the FMLA, Plaintiff and the members of the Proposed FMLA Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

198.     Deloitte's unlawful conduct in violation of the FMLA was intentional and/or was not carried out in good faith and, therefore, Plaintiff and the members of the Proposed FMLA Class are entitled to an award of liquidated damages.

## THIRD CAUSE OF ACTION
### (Disparate Treatment Gender Discrimination in
### Violation of the NYSHRL – Individual and Class Claims)

199.     Plaintiff, on behalf of herself and the Proposed Disparate Treatment Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

34

200.     As described above, Deloitte has committed violations of the NYSHRL against Plaintiff and the members of the Proposed Disparate Treatment Class by, *inter alia*, discriminating against Plaintiff and the members of the Proposed Disparate Treatment Class on the basis of gender.

201.     As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYSHRL, Plaintiff and the members of the Proposed Disparate Treatment Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

202.     Deloitte's unlawful conduct in violation of the NYSHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Treatment Class and, therefore, Plaintiff and the members of the Disparate Treatment Class are entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
**(Disparate Treatment Gender Discrimination in
Violation of the NYCHRL – Individual and Class Claims)**

203.     Plaintiff, on behalf of herself and the Proposed Disparate Treatment Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

204.     As described above, Deloitte has committed violations of the NYCHRL against Plaintiff and the members of the Proposed Disparate Treatment Class by, *inter alia*, discriminating against Plaintiff and the members of the Proposed Disparate Treatment Class on the basis of gender.

205.     As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYCHRL, Plaintiff and the members of the Proposed Disparate Treatment Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for

which they are entitled to an award of damages.

206.    Deloitte's unlawful conduct in violation of the NYCHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Treatment Class and, therefore, Plaintiff and the members of the Disparate Treatment Class are entitled to an award of punitive damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Disparate Treatment Pregnancy Discrimination in**
**Violation of the NYSHRL – Individual and Class Claims)**

207.    Plaintiff, on behalf of herself and the Proposed Disparate Treatment Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

208.    As described above, Deloitte has committed violations of the NYSHRL against Plaintiff and the members of the Proposed Disparate Treatment Class by, *inter alia*, discriminating against Plaintiff and the members of the Proposed Disparate Treatment Class on the basis of pregnancy.

209.    As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYSHRL, Plaintiff and the members of the Proposed Disparate Treatment Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

210.    Deloitte's unlawful conduct in violation of the NYSHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Treatment Class and, therefore, Plaintiff and the members of the Disparate Treatment Class are entitled to an award of punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Disparate Treatment Pregnancy Discrimination in
### Violation of the NYCHRL – Individual and Class Claims)

211.    Plaintiff, on behalf of herself and the Proposed Disparate Treatment Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

212.    As described above, Deloitte has committed violations of the NYCHRL against Plaintiff and the members of the Proposed Disparate Treatment Class by, *inter alia*, discriminating against Plaintiff and the members of the Proposed Disparate Treatment Class on the basis of pregnancy.

213.    As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYCHRL, Plaintiff and the members of the Proposed Disparate Treatment Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

214.    Deloitte's unlawful conduct in violation of the NYCHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Treatment Class and, therefore, Plaintiff and the members of the Disparate Treatment Class are entitled to an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Disparate Impact Gender Discrimination in Violation
### of the NYSHRL – Individual and Class Claims)

215.    Plaintiff, on behalf of herself and the Proposed Disparate Impact Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

216.    As described above, Deloitte has committed violations of the NYSHRL against Plaintiff and the members of the Proposed Disparate Impact Class by, *inter alia*, implementing and enforcing a policy that has an unlawful discriminatory impact on women.

217.     As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYSHRL, Plaintiff and the members of the Proposed Disparate Impact Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

218.     Deloitte's unlawful conduct in violation of the NYSHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Impact Class and, therefore, Plaintiff and the members of the Disparate Impact Class are entitled to an award of punitive damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### (Disparate Impact Gender Discrimination in Violation of the NYCHRL – Individual and Class Claims)

219.     Plaintiff, on behalf of herself and the Proposed Disparate Impact Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

220.     As described above, Deloitte has committed violations of the NYCHRL against Plaintiff and the members of the Proposed Disparate Impact Class by, *inter alia*, implementing and enforcing a policy that has an unlawful discriminatory impact on women.

221.     As a direct and proximate result of Deloitte's unlawful discrimination in violation of the NYCHRL, Plaintiff and the members of the Proposed Disparate Impact Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

222.     Deloitte's unlawful conduct in violation of the NYCHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and the members of the Proposed Disparate Impact Class and, therefore, Plaintiff and the members of the Disparate Impact Class are entitled to an award of punitive damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL – Individual Claims)

223.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

224.    As described above, Deloitte has retaliated against Plaintiff in violation of the NYSHRL by, *inter alia*, terminating her employment because she engaged in activity protected under the NYSHRL.

225.    As a direct and proximate result of Deloitte's unlawful retaliation in violation of the NYSHRL, Plaintiff has suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

226.    Deloitte's unlawful retaliatory conduct in violation of the NYSHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and, therefore, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL – Individual Claims)

227.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

228.    As described above, Deloitte has retaliated against Plaintiff in violation of the NYCHRL by, *inter alia*, terminating her employment because she engaged in activity protected under the NYCHRL.

229.    As a direct and proximate result of Deloitte's unlawful retaliation in violation of the NYCHRL, Plaintiff has suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

230.     Deloitte's unlawful retaliatory conduct in violation of the NYCHRL was willful and/or wanton and/or in reckless disregard for the rights of Plaintiff and, therefore, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Proposed FMLA Class, the Proposed Disparate Treatment Classes and the Proposed Disparate Impact Classes, pray that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      Reinstatement;

B.      Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed FMLA Class;

C.      Designation of the Plaintiff as a representative of the Proposed FMLA Class;

D.      Designation of Plaintiff's counsel of record as class counsel for the Proposed FMLA Class;

E.      Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed Disparate Treatment Classes;

F.      Designation of the Plaintiff as a representative of the Proposed Disparate Treatment Classes;

G.      Designation of Plaintiff's counsel of record as class counsel for the Proposed Disparate Treatment Classes;

H.      Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed Disparate Impact Classes;

I.      Designation of the Plaintiff as a representative of the Proposed Disparate Impact Classes;

40

J.      Designation of Plaintiff's counsel of record as class counsel for the Proposed Disparate Impact Classes;

K.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

L.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

M.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect the lives of Plaintiff and the members of the Proposed FMLA Class, the Proposed Disparate Treatment Classes and the Proposed Disparate Impact Classes;

N.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the members of the Proposed FMLA Class, the Proposed Disparate Treatment Classes and the Proposed Disparate Impact Classes for all monetary and/or economic damages;

O.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the members of the Proposed FMLA Class, the Proposed Disparate Treatment Classes and the Proposed Disparate Impact Classes for all non-monetary and/or compensatory damages;

P.      An award of liquidated damages;

Q.      An award of punitive damages;

R.      Pre- and post-judgment interest on all amounts due;

S.      An award of costs that Plaintiff and the Proposed FMLA Class, the Proposed Disparate Treatment Classes and the Proposed Disparate Impact Classes incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

T.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages.

Dated:  December 4, 2020
        New York, New York                              Respectfully Submitted,

                                                        **WIGDOR LLP**


                                                        By: _____
                                                            Michael J. Willemin
                                                            Sarah J. Arena

                                                        85 Fifth Avenue
                                                        New York, New York 10003
                                                        Telephone: (212) 257-6800
                                                        Facsimile: (212) 257-6845
                                                        mwillemin@wigdorlaw.com
                                                        sarena@wigdorlaw.com

                                                        *Attorneys for Plaintiff and Proposed*
                                                        *Attorney for the Proposed FMLA Class, the*
                                                        *Proposed Disparate Treatment Classes and*
                                                        *the Proposed Disparate Impact Classes*